The last case on calendar is case number 25-4844 Elizabeth Rehn v. City of Seattle John Deustz and Jason Drummond There's a button right underneath you can lower that if you want. Good morning and may it please the court, Katherine Rito for the City of Seattle and the named Seattle Police Department officers. I'd like to reserve four minutes for rebuttal please. Qualified immunity exists to protect officers who are making split-second decisions in rapidly unfolding circumstances. The trial court erred when it denied qualified immunity to these officers who responded to a potentially life-and-death emergency 911 call. Officers actions here were objectively reasonable. There was no constitutional violation and there was also no clearly established law that addresses similar actions taken in similar circumstances. They were at the wrong building. Yes, they were. How does that fold into reasonableness? So officers were at the wrong building. There are, and I would refer to the court to page 7 of the city's opening brief for a Google map showing the layout of the two buildings. They share an adjoining wall and there are two buildings that fully encompass a triangular intersection. And when officers arrived at the location, they navigated there using the address provided by dispatch, which was the correct address. The city is not disputing that. Officers parked and began to canvas the area looking for signs of this ongoing disturbance, which was reported to be either suicide, potential domestic violence with self-harm and use of a knife and drug use. When officers arrived and walked, they walked up Warren Street and that's the back of these two buildings. There's no entrance on Warren Street. They turned left onto Denny and observed Officer Kim and Officer Wagner observed broken glass and debris in the street. They turned around and proceeded back down Warren. Again, at this point, they had not seen any entrance to a building. When they got back to the corner of Ms. Rain's apartment building entrance, that's on the corner of Warren Place and First Avenue. Officers had only seen one door to the building and they mistakenly believed that that was the entrance to the building that they were dispatched to. It had an address, didn't it? It did have an address.  Your Honor, there is no evidence in the record that the named officers here actually saw the correct address prior to entering the building. Did they ring bell 404 before they actually got entry? Didn't they ring the bell? Your Honor, prior to entering, it was a lockout apartment and Officer Wagner pushes buttons. Nobody answers. As he steps away to ask dispatch to call fire, another resident who's walking his dog actually approaches and just opens the door for officers and they go upstairs. And based on what officers had seen at this point was their observations corroborated what they knew from dispatch. There was no evidence that indicated that there was no ongoing emergency. And so officers acted rapidly because they believed that they were responding to the correct location in order to prevent a potential domestic violence incident, a potential murder, a potential suicide. When they got to Ms. Rain's door, they knocked and announced their presence. They heard a female voice followed by silence and no one opens the door. And at this point, Officer Caulfield specifically points out in his general offense report. That based on the silence and based on the lack of response that to him indicated that someone inside might be dead or dying, that there may have been a murder, that someone could be in trouble and that they had to make exigent entry in order to address this unfolding crisis. And so taking the totality of the circumstances here, which is the analysis the court has to do, officers entry into Ms. Rain's apartment was reasonable, even though it was a mistake. The Fourth Amendment does not require perfection. It does not require a mistake is not in and of itself a violation of the Fourth Amendment. That analysis depends on the totality of circumstances and whether officers actions were reasonable, considering the totality of the circumstances that they faced in that situation. Counsel, in your opinion, what do you think is the strongest case that your friend on the other side has to show that qualified immunity should be denied here? And why would that case be distinguishable in your view? Your Honor, I don't think my friend on the other side, Mr. Ford, points to any cases that would show that the law was clearly established. Many of the cases cited by Ms. Rain are out of circuit cases. They occurred after the incident in question, which was in November of 2020. And so they have no bearing on the qualified immunity analysis or the facts of cases that did occur prior to 2020 are so distinguishable that they're completely unpersuasive for this court. This court has to look at, excuse me, Ms. Rain has to provide a case. It is her burden to provide a case where officers acted under similar circumstances and took similar actions. And that is just not present here. That is the case, excuse me, in Zorn, which recently came out from the Supreme Court. That is the holding that the court and the requirements that the court describes is that in order to find a right was clearly established, there must be, it must involve similar actions taken by officers in similar circumstances. And such that any reasonable office, excuse me, every reasonable officer would know that what they are doing violates a constitutional right. And it's very clear here that not every reasonable officer would know that they were making a mistake based on the actions that they took prior to that mistaken entry. Do you concede that the officer who first entered Caulfield had his gun briefly pointed at Ms. Rain? Thank you, Your Honor. No, and that is the only factual dispute that the district court points out. Well, even if he had pointed his weapon briefly at her, would that rise to the violation of excessive force? No, Your Honor, that would not be excessive force. Taking Ms. Rain's version of events that the firearm was pointed at her, it was immediately lowered when Officer Caulfield realized that it was Ms. Rain and that she did not pose a danger to officers. He immediately lowered his firearm. Officers contacted Ms. Rain. They lead her out of the apartment. She's very compliant and no weapons are ever pointed in her direction again. But it's not unreasonable for an officer entering what they believe to be a domestic violence situation, entering into an unknown situation. And again, accounting for the fact that domestic violence situations are extremely volatile and extremely dangerous. It was not unreasonable for the officers to have their firearms out. And even if Officer Caulfield pointed his firearm at Ms. Rain, it was momentary. This court has never held that momentarily pointing a firearm is a violation of the Fourth Amendment. That's also a very factually intensive analysis that the court has to do. And it depends entirely upon the circumstances and the manner in which the gun is pointed. In the cases cited by Ms. Rain, again, if they occurred prior to 2020 or if they occurred after 2020 and can go to the Fourth Amendment analysis, they're readily factually distinguishable from the case that occurred here. Those cases involve officers pointing firearms at people's heads at point blank range, threatening to kill them, shooting their dog. There are multiple cases that involve that. And that's not what happened here. And to add to that, other cases that discuss pointing a firearm at somebody and when it is unreasonable, a lot of those cases involve search warrants that were preplanned. The court in Baird v. Renbarger discusses that it's objectively unreasonable to wield a submachine gun based on a suspected crime of altering a vehicle identification number. The suspected crime that occurred here, again, involved domestic violence that's much more serious than suspected altering of a vehicle identification number. In Motley v. Parks, which was also cited by Ms. Rain and the court, it was unreasonable for officers to point their firearm at a five-week-old infant and then keep that firearm trained on the infant while they were searching the infant's mother's home. And then in Thompson v. Rohrer, the court there found it was an unreasonable use of a firearm, but still granted qualified immunity. And in that case, the suspect was pulled over for driving with a suspected suspended license and violating the Uniform Firearm Act. Your factual argument, as I understand it, is that a weapon was not pointed at Ms. Rain? Correct. Then how do you know that the weapon was lowered? Your Honor, when Officer—thank you for the clarifying question. When Officer Caulfield first entered, he had the firearm held at the low ready position. It was not on target. And as he enters Ms. Rain's apartment, he's the first in. He has his firearm at low ready, which means it's not pointed on target at an individual. It's angled towards the ground. When he turns the corner and sees Ms. Rain, you can see that the angle of the firearm further decreases as he lowers the firearm even more to point towards the ground. That's his body camera, correct? That is Officer Caulfield's body camera, correct. And this entire incident is captured on body-worn video that, under Scott v. Harris, the court needs to accord that as factually correct of what happened in this incident if there is conflicting testimony. And again, the district court, Judge Jones, relied on that body-worn video when he found that the only dispute of material fact was whether or not Officer Caulfield pointed his firearm at Ms. Rain. May I reserve the remainder of my time? Of course. Thank you. Thank you, Counsel. Please, the court. My name's Tim Ford. I represent Elizabeth Rain. Ms. Rain was in her bathroom when she heard pounding on her apartment door. She went to the door and she said, who is it? The answer was, open the door now. She was stunned. Five seconds later, she heard, open the door or we're kicking the door. And the door started getting bashed in. She picked up a teapot because she thought somebody was invading her to attack her. Thank God she didn't pick up a knife or even her cell phone and they thought it would be good. She'd be dead. So do you dispute that the body-worn camera captures them saying Seattle police intermittently as they're demanding that the door be opened? No, they don't say it intermittently. They say it once. Okay. At the very beginning. And she says she heard it, although that doesn't really matter. Because the question is the objective view of an officer. She said to them, who is it? And they said, open the door now. Open the door or we're kicking the door. They never answered her question. Miller versus the United States, Supreme Court of the United States. Officers knocked on the door. Didn't have a warrant. Person said, who is it? They said, police, very quietly. Then they kicked in the door. The Supreme Court of the United States, 1958, held that violates the Constitution because they didn't say their purpose. They have to say their, announce their presence and their purpose. That's been the law since 1603. It was the unanimous Supreme Court decision, nine to zero, in Wilson versus Arkansas, 1980s. Justice Thomas said, you have to say your presence and your purpose. The reason for your coming. And the reason, he quoted, we sent a 28J letter to the court recently about Kerr versus California. And the dissenting, excuse me, opinion there. And they go over the reasons for saying the purpose. So they won't make a mistake. So they won't be in the wrong place. The person can say, I'm not, this is not the place where this happened. Nobody's in trouble here. There's a Washington State statute that requires them to say their purpose. And if they just said to Ms. Wren, did you call 911? We're Seattle police. We're checking on a welfare check. We got a 911 call. Any of those things. She would have known. She could have answered you. Oh, that's what a citizen is entitled to. There were three clearly established constitutional violations here. All of them contributed to the mistake. The other one was, counsel said, there were these reports. And remember, they destroyed the tape of the dispatches that these officers received. But we know that they were told it was screaming, fighting, things going on somewhere. We don't really know where. When they got to the third floor, they heard nothing. They saw nothing. Counsel said, that corroborates that there was something going on? Because there was nothing? I think what she said is, looking at the reasonable officer's response to that silence, it is reasonable that the officers anticipated that the woman who is supposedly the victim, and who one of the callers described as on the verge of being thrown out of a window, might have been injured or incapacitated in some way. I think that was what she said. And all of these things have gone silent, and that's corroboration? What could be not corroboration? Not corroboration. I think what she said was that looking at a reasonable officer's response to that silence, they could have believed reasonably that the victim had been harmed and was no longer able to respond. Well, I guess you could say that, and that's wild speculation. They're not presumed. Remember, the presumption is that it's unconstitutional. They have to prove it was reasonable. It was reasonable to believe after hearing about screaming and fighting and drugs or whatever they heard, and remember, we're entitled to the inference that that's all favorable to us, that they heard about a lot of noise, that's all they heard about, and then they got there and they saw nothing, and they heard nothing, and somebody answered and said in a very quiet voice, not screaming or with panic or pain or anything, who is this? That was corroboration, that there was this violent thing going on? And there are cases, this case, courts, I think, had a Bailey case. The cases we cited from the other circuits, the counsel said, are all after. They all involved incidents that happened before this one. I looked at them all yesterday, and they all involved situations where the court said, when you get to a scene, you have to see the affray. That's the common law. Again, this is common law. This goes back hundreds of years. You can't break in a door based on somebody telling you there's an emergency unless you see something that corroborates it, unless you hear something that corroborates it. That's what happened in the Bingham City case. That's what happened in Case. What's your best case that, in this kind of circumstance, law enforcement officers must announce who they are and why they're there? Miller v. United States and Wilson v. Arkansas. Supreme Court of the United States both times. And then you've got to go back to, what is it, Seaman's case? I'm sorry, it's cited in Miller. It's called Seaman's case, 1603. The officer has to show the reason for his coming. Kerr v. California, they say you have to show the reason for your coming. There's a Washington State statute. Everybody knows this. 1603, is that the House of Lords? I don't know what it is. It's the King's Banshee, I guess. I'm not sure. I don't know the difference between those. And Justice Thomas goes over this history and says, this has always been the law. This is always the law of the United States and England. You have to announce your presence and your purpose. RCW 10-31040 says the same thing. The law of the United States has always said that. Police officers with a warrant. Police officers on a welfare check. Police officers, is everybody okay there? Police officers have an arrest warrant for John Doe. That's what they're supposed to do. They didn't do it. So, sir, I think the Caulfield body cam shows that when they first arrived at the apartment door, 404, there was a statement, Seattle Police Department, open the door or we're coming in. And then the woman's voice, what the F, who is that? And then a response, open the door now, open the door, we're kicking the door. Then the doors kicked. They enter the apartment. An officer announces Seattle Police as they enter the apartment. Wren then responds, what? Hello. So there were two announcements based on the body cam footage of Officer Drummond and Officer Caulfield. But they had already entered the house, Your Honor. They'd already violated. But they were announcing outside before they kicked the door in and warned her that they would kick the door in. The first time they said it and she said, who is this? Exactly what happened in Miller versus United States. The person said, who is this? And the officers kicked the door. They didn't say their reason. That's what the law is. And once they're in the apartment, once they've already kicked the door and crossed the threshold, that doesn't count. They have to do it before. And the reason is so someone will know what they're doing. Well, no, if they said, you know, somebody's committing suicide. And they called. Remember, some of these dispatches sound like the person's actually asking for the police. And he says, I'm going to commit suicide if the police can't get in here. Why in the world would they not say, Seattle Police, did someone call 911? That's what you say. They never said it. They demanded entry. And they did exactly the kind of thing that had the Seattle Police Department under court order for 10 years. They escalated a mental health situation into a dangerous situation where it's fortunate that nobody got killed. Now, you know, they've gone back. They never say what their actual reason was. They say it would involve suicide or domestic violence or whatever. They've denied it was a criminal investigation. If it's domestic violence, that's criminal. That's a whole different analysis than they presented before. One of the 911 calls said that they heard a woman screaming for help. He was throwing items out of the window, breaking glass, and doing something to a female, possibly physically assaulting her. They were also told that by one caller that a person in an apartment 404 is pushing someone out of a window. Yes, Your Honor. So they're arriving with that information. I agree.  I would have said this is a criminal investigation. They need probable cause. They need an exit in circumstances. They said, oh, no, no, this is welfare. So that's their choice. Supreme Court says it doesn't matter. It's objectively reasonable. I'm sorry. All right, so they did say a purpose. They said we're doing a welfare check. I don't think that's what it shows. No, no, I'm saying that the city attorneys have said that. The city attorneys have gone back and forth. One of the reasons if they'd said what their purpose was, we'd know what the analysis was. But they never said what their purpose was for going in. And if they'd just done that, if a jury could find maybe, well, maybe it wouldn't make any difference. But that's what the Constitution clearly requires for hundreds of years from the Supreme Court of the United States all the way down to RCW 1041. Also, cases from this court, other courts, Supreme Court, back into the common law saying you have to see corroboration on the scene. You can't go on a third-hand report, especially when the third-hand reports are lost. They destroyed them. We're entitled to the benefit of the idea that third-hand reports were good for us. They saw glass on the sidewalk. Well, they saw glass on the sidewalk around the corner. Right. Well, actually, that's important. This is their chart. This is where, this is Denny. They saw glass down here. Ms. Wren's apartment is over here. She looks out onto Warren. They weren't even on the right street. They never went down the right street. The right street was First Avenue. They never went down First Avenue. Other officers went down First Avenue. Other officers entered the correct apartment before they entered Ms. Wren's apartment. They could have asked on the radio, hey, there's nothing going on here. Is this the right place? And counsel said there's no evidence that they saw the address on the door. He showed you the picture. It's right there. Jurors can find that people see things that are directly in front of them. They looked at it. They stood in front of it for 30 seconds. Now, counsel, I have a question. You pointed to Miller as your best case.  You don't really articulate why in your brief. I see it cited on page 1. No, we cite it later on when we say that they did not announce their purpose.  But Miller didn't involve an exigent circumstances or emergency aid exception scenario, right? It didn't involve emergency aid exception. I think it did involve exigent circumstances. They were in hot pursuit of a drug dealer at that time. I think that was considered to be exigent circumstances. And there are exigent circumstances exceptions to stating your purpose. And they talked about it in Wilson, talked about it in Kerr. If there's a reason to believe, they'll destroy evidence. That might be a reason not to say your purpose. If there's a reason to believe that something will happen as bad as a result of saying your purpose, people will flee or whatever, they'll respond. So you acknowledge there are exceptions to the general knock and announce rule. But as the trial court pointed out, they were there for over a minute. How long does it say? Is everybody okay? We got a 911 call. Can I help you? Seattle Police, is somebody hurt? How long does that take? It takes no time. They've never said any reason they shouldn't have done that. They've never said any reason. I mean, I've never heard anybody say that seeing nothing is corroboration that something is going on. No case says that. Many cases say seeing nothing is an indication that nothing is going on and that maybe you're in the wrong place. That's why those rules are in place, so you don't go into the wrong place and possibly kill somebody who thinks that you're an invader. That's exactly why these rules are in place. So I guess, I mean, I have a Supreme Court case, 9-zip, written by Justice Thomas that says this is the law in black and white. I don't know what else to offer. The counsel says that doesn't even exist. They don't apparently follow this rule. It's the law of the state of Washington, law of the United States, law of common law, saying your purpose. And if you don't have a warrant, you have to prove that there was some reason for you to believe that you had to kick in the door right then. You couldn't check with dispatch. You couldn't do anything else. And they stood there. They stood there, and they stood there. And somebody asked them, who is this? And they said, open the door now. That is the kind of policing that the Constitution was meant to curb. Thank you. Thank you, counsel. Thank you. Very briefly, Your Honors, Mr. Ford makes reference to the district court's spoliation order. That was an order against the city of Seattle. It has no bearing on the actions of the named officers here. The court should not be considering that in their analysis of the named officers' actions. Mr. Ford cited Miller and Wilson v. Arkansas when this court was asking about whether or not the entry was reasonable. In both of those cases, they talk about the knock-and-announce requirement. Officers here did knock multiple times. They announced their presence, and they announced that they were with the Seattle Police Department. This is not a bright-line requirement. It's part of the reasonableness analysis that the court must undertake in determining whether or not there was a Fourth Amendment violation. You concede, in this circumstance, they did not say, we're from the police and we're responding to X. Correct, Your Honor. Did not happen. They did not. They assumed that silence meant something was wrong. They did not announce the purpose for their presence. They announced who they were, and I would say they didn't assume anything. I think they reasonably inferred that silence could mean that someone inside was in danger and in grievous need of attention. And in both of those cases, Miller and, excuse me, Miller is discussing the possibility of a search warrant, where the knock-and-announce requirement is much more important. That's why there is case law about when you can execute a no-knock warrant. Officers here were not executing a search warrant. They were not executing an arrest warrant. They were responding to a rapidly unfolding crisis. And the question here, in terms of the qualified immunity, or, excuse me, in terms of the Fourth Amendment analysis, is whether officers acted reasonably under the circumstances at the time, and not whether the opposite conclusion was also reasonable or even more reasonable in hindsight. That's been long-standing law, that the court needs to evaluate officers' behavior and without the benefit of 2020 hindsight. Qualified immunity is in place for a reason. It gives room for officers to make reasonable mistakes because we do not want to discourage officers from taking rapid action to save lives. Officers in this case were acting with limited time. Again, they were not executing a search warrant. They did not previously conduct reconnaissance or visit this site. And so based on what they observed, their actions were reasonable, even though they made a mistake. It is Ms. Raine's burden here to prove that officers violated a constitutional right that was clearly established. Ms. Raine has cited no case law occurring after 2020 that is involving similar circumstances where officers took similar actions where it would be held that officers violated a constitutional right that was clearly established at the time. Under Zorn, a right is clearly established when it is sufficiently clear that every reasonable officer would understand that what he was doing violated that right. The denial of qualified immunity by the lower court was error, and we respectfully request that this court grant qualified immunity to these officers here. Thank you, Counsel. The case is submitted. All rise.
judges: HAWKINS, TUNG, Matsumoto